Good morning. May it please the court. My name is Joseph Canfield. I'm here on behalf of the appellant, the Arizona Secretary of State. The purpose of Arizona's open primary law is to enfranchise voters in the primary election where many of our elections are decided. This case is nothing like the California Democratic Party v. Jones case that was relied on by the Appellees, which struck down California's blanket primary. Under that system, any voter could vote for a candidate in the primary election regardless of party affiliation. Here, only the voters who are otherwise unaffiliated with a recognized party may vote in that party's primary, and they may vote in only that party's primary. This narrow open primary targets only those voters that are otherwise disenfranchised under the previous closed primary system. The district court erroneously struck down the open primary because it permitted these voters to vote for the Office of Party Precinct Commitment. The court did not have a problem with the voters voting for candidates, and in fact commended the state for opening the process for voters to vote for the candidates. This ruling was erroneous, however, because the voters that choose to vote in a recognized party primary are expressly affiliating themselves with that party. Moreover, the ruling was erroneous because even if the court below is correct, the open primary which is set forth in the Arizona Constitution does not require that this office even be on the primary election ballot. May I interrupt you for just a moment? What do you understand the district court to have ruled? Do you understand the ruling to be only that the permitting independents to vote for precinct committeemen is, precinct committee people, is unconstitutional? Or did the court strike down the whole statute? The court struck down the entire provision. It was part of the Arizona Constitution. But the court was only troubled by the fact that the law allowed for these non-party members to vote for the Office of Precinct Committeemen. But the court felt that that was part of the constitutional provision itself that apparently could not be severed out and struck down the ---- But it didn't rule specifically on severance, I take it. It did not. It did not rule on severance. And that wasn't addressed. It's addressed by the amicus in their brief. But it was not addressed in our brief or below. I have a question. You argued that by choosing a libertarian primary ballot, a previously unaffiliated voter is choosing to affiliate with the libertarians. Yes, Your Honor. But in ---- if that is the case, as I understand in Arizona, and please correct me if I'm wrong, in order to determine whether your party can get on the ballot, you have to have a certain number of people who have registered. So voting libertarian is not the same as registering libertarian. I mean, if we were to hold that, shouldn't there be some way then that the State should count those people as libertarians so that their party can appear on the ballot? Well, Your Honor, there are two methods by which a party becomes recognized. And the one which you're referring to is by virtue of voters who vote in the general election. Maybe I'm getting myself mixed up here. I'm sorry. There's two. The first method by which you're referring to is this number of registered voters on the books. If it's a certain percentage, then the party becomes recognized and will have a place on the ballot. And you're correct in that these voters who affiliate with themselves during the open primary aren't counted with respect to that number. However, there is another method by which the parties become recognized, and that's by the general election. If they receive a certain percentage of the vote for the office of governor or the office of presidential elector, depending which election it is, then they will receive continued ballot access. And the voters who vote not for that party are counted, whether or not they're independents or even Republicans. So they're not being shut off from a vote. But not so in the primary. And yet those people can affect the candidates of that party. Yes, Your Honor. Okay. Well, as I read the cases, the Supreme Court has held that the party's right to exclude others is strongest in the selection of a party's nominees. Now, here, let's assume that the district court is right, that selecting the selectmen or the committee. Precinct committeemen. Why then be equally so for selecting the party's candidate? Isn't this really an important right of association here? Well, Your Honor, I keep ‑‑ I look at the Jones case because we both agree that that case is relevant. They think it's controlling. We think it's distinguishable. But it is relevant. And in that case, the court did not disagree, did not strike down an open primary like Arizona's. And its main concern was with adherence of party opponents voting for the party's election. And in the blanket system where anybody, a Democrat, could vote in a Republican primary and vice versa, that's not the case here. Because, you know, either otherwise ‑‑ I realize that. And I realize that the major parties welcome the open primary. What would be wrong with interpreting the statute to allow the libertarians to opt out of the primary, opt out of the open primary? That's certainly a possibility and one which we address at the end of our brief as an alternative. We don't believe that that's necessary. We believe that the state has sufficient interest to justify the system as it is. This is a publicly financed primary. And a compelling state interest is to increase voter participation and to enfranchise those voters that for whatever reason may not choose to fill out line five of the Arizona voter registration form and put the word libertarian or Republican or Democrat. The example that I always go to is an 18‑year‑old who is registering to vote, may not at the time that that individual registers know where his political or her political philosophy lies. But as the campaign progresses, that person realizes after hearing the arguments that, well, perhaps I'm a Republican or perhaps I'm a Democrat or perhaps I'm a libertarian. Well, I understand the purpose is quite valid, but I'm worried about the balancing is with the right of association of a party such as the libertarians where non‑libertarians by voting in the primary can simply wipe out their candidates. Fair enough. And it is a balance. We agree that the test is a balancing test. And what we have argued is that here under Jones, you have to show that there is a real risk of what you just mentioned is going to occur, and they haven't shown that here. This is what I was going to ask about. Do you regard the question of whether or not there's a real risk that independents may come in and try to influence the decision, do you regard that as a factual question under Jones? Yes, Your Honor. Yes. And I think Jones provides a roadmap to bringing a valid claim of a severe infringement on a party's associational rights. And in that case, the court found expert testimony, statistical, empirical evidence, which showed that there was a very real risk, as Justice Scalia said, a clear and present danger that adherence of the party's opponents were going to in fact come in and affect the outcome of the election. But that made sense in the California blanket primary where a Democrat could vote in the Republican primary where you have recognized party members voting in other recognized party members' primaries. Now, the Arizona open primary was designed specifically to avoid that situation, to say if you're not registered with an otherwise recognized party, well, you may affiliate yourself with one for the purposes of the open primary, but you may only vote in that primary, in that party's primary. Well, I guess I'm not quite understanding. Maybe you're arguing both. Whether the argument is that there's no factual showing that the independents are going to do this or the question is or you're arguing that as a matter of law, independents by definition are not opponents and therefore can't give rise to the kind of harm that the court was concerned about in Jones. I guess I don't have to go that far. I guess I don't have to go that far. If I can follow up on Chief Judge Schroeder's line of questioning. Sure. Is it your argument, based on your assertion that this is a factual question under Jones, that the parties should be allowed to present evidence at the district court on a remand on the question of whether or not the allowing of the independents or non-affiliated voters to vote as to candidates unduly interferes? That would be one option. We don't think it's necessary in this case. Because it's so obvious that they don't interfere? Well, for one, there was the district. Affidavits weren't there. There was an affidavit by the chairman of the Libertarian Party saying, it was a conclusory saying that independents by definition can't believe in what we believe in. But then we entered an affidavit to show that that's not true. Emily Dudak is independent with Libertarian leanings. So to assume that all independents are anti-Libertarian. Let me ask another question. How would the Libertarians know who voted? Whether it was an independent who voted Libertarian in the primary or whether it was a Libertarian because Arizona doesn't keep those records. In other words, unless they register as a Libertarian, they're not counted as a Libertarian. Although they may vote Libertarian in the primary, but there is no requirement that they sign an affidavit I joining the Libertarian Party. Therefore, even though there's a very small number of people who vote, and I guess it was less than 25% of the registered Libertarians voted, how do we know that it was Libertarians who voted? I mean, until Arizona keeps records of that kind, how can the Libertarian Party be held to account for that? Well, we don't know what the true philosophy of the independents that voted. And the only way we could ever know that, I suppose, is by doing exit polling or doing surveys. Or requiring them to register as Libertarian and keeping those records. Sure. And the requirement to register as a party member in the state of Arizona, at least for purposes of the primary, is simply on the voter registration form, which is part of the excerpts of the record. Of course, that would be in the teeth of what this initiative was designed to achieve, which was to let independents vote in primaries. Well, yes, to let people that haven't written in a party name on line five of the voter registration form to at the time of the election. I mean, they can simply re-register and write in the party name, or they can ask for the open primary ballot and vote in the party's primary. I mean, to the state, there's very little difference between those two. Well, there's quite a bit of difference in terms of being able to put your party on the ballot. If you're voting Libertarian and you're an independent, that doesn't count toward your party. So it does make a difference. But if those same people are so inclined to vote for the candidates in the general election, then their votes will count and their votes will help give the party continued ballot access. So, yes, but there's one, you're right, if they register as Libertarians and they do get ballot access by virtue of the numbers, but they also get ballot access by virtue of the votes in the general. In the general election. All right. We talked about the burden of proof. Well, we talked that the test to apply is important here. And in Jones, the court held that there was a severe burden on the party's associational rights and applied the strict scrutiny test. So we don't think that this court needs to apply strict scrutiny. We think that the court needs to apply the lesser scrutiny that was set forth in the other election cases that were cited, the Timmons case and the Burdick case, where there clearly were burdens on the party's rights in those cases, but they weren't severe enough to justify the state having to show compelling state interests that were narrowly tailored. Here we think that there are legitimate state interests that establish the need for this open primary, that enfranchise voters, that increase voter education and voter participation and impose a very limited burden on the parties. And to the extent that it does, it is greatly outweighed by the interest in opening up the process to these voters. We talked about the plaintiffs having met the. Can I interrupt for just a minute? We've been spending almost all of our time questioning you on the ability of non-affiliated voters to vote in the libertarian primary as to candidates. And we've not been focusing on the ability of such unaffiliated voters to vote on leaders within the libertarian party. I think it may be that those are really quite different questions. And are you arguing that or are you arguing very strongly that that aspect, that the ability to vote on libertarian officers is also constitutional? Because I think you're much more vulnerable on that point. Yes, Your Honor. We are arguing that the system is constitutional with respect to the precinct committee persons. We are – we think that – well, for one, one thing we need to clarify is that the difference between what the cases like you and Tehseen just talked – when they were talking about affecting internal party governance and what we have here, and that here the libertarian party is recognized by the state has basically three essential functions. One is to get – it needs to be a recipient of the voter registration information. It receives the income tax donations that come from the voter registration form. And it also serves a role in replacing party officeholders who resign or who are removed from office. It doesn't affect the party's organization in terms of how it decides what its message will be, its own structure. And that, we believe, is a critical distinction because that is what the court in you and Tehseen was most concerned with, was unduly interfering with the party's internal self-governance. Now, to the extent the precinct committee persons vote for the state party's chair, which is recognized by the state, yes, you are getting into internal party dynamics, but not to the level of interference that was held unconstitutional in you, where the court – where California was telling the party whether they could not endorse candidates in the primary, was telling them how setting term limits for their leaders, was setting geographical restrictions on how the party organization could be structured. And we think this is very different here. And, again, we go – Well, how is it different? Could you explain it to me how it's different? Because here we're not dictating how the party should conduct itself or be organized or what its message should be or how it comes about in developing its message. We're simply voting for precinct committee persons who have limited authority under the state statutes. And, again, I go back again to the primary argument, which is, again, affiliation by participation, which is if you are voting in the primary, you are affiliating with the party, which is a little different than registering as a party member. If I recall, the precinct committee people, aren't they the – don't they make up the state democratic committee that elects the party chairman and all of that? Yes, but keep in mind, though, that the chair of the party, as recognized by the state, again, has limited authority. It doesn't – that is not necessarily the party that generates the party's platform and the party's message. And that's the speech that is so critical and that the court is so concerned with in these other cases. We think there's a distinction here. Now, having said all that, we acknowledge that the court below was only concerned with the election of precinct committee persons, and we set forth a couple of alternatives as to how this case could have been decided so as not to affect the other recognized parties who aren't here and aren't present in this case, arguing the same burdens. And one was to simply, as the judge mentioned earlier, remove the libertarians from the process and allow them to opt out of the open primary and to revert to the closed primary system. And another would be to just simply remand the case back to the district court to address 16.821 and the other ballot statutes that say that the precinct committee person should appear on the ballot at the same time as the – Well, if you did the opt out, you'd preserve the constitutionality of the statute, would you not? Yes, Your Honor. And actually give the libertarians everything they needed. That's possible. At this point, I'd like to reserve the remainder of my time for you. Thank you. You have about a minute and a half. May it please the Court. I'm Dave Hardy. I'm an attorney for the Epelese in this case. What we're dealing with here, well, as Justice Douglas once remarked, the First Amendment is first for a reason. More than that, we're dealing with the core of the First Amendment, political expression and organization in connection with election of candidates. Even within that, we're dealing with the core, because the Supreme Court has recognized the very core of political activity in a party is its choice of its candidate and the choice of its leadership. So in a very meaningful sense, we've reached the very center of the Constitution and certainly of the First Amendment here. Under the Timmons case, the courts employ a bifurcated standard when looking at these things. As to a serious or significant infringement of First Amendment restrictions, of course, strict scrutiny applies, and that we maintain applies here. It goes without saying that under any standard of strict scrutiny, the statute fails. So let me pass on to the other arm of Timmons, which is that if a lesser infringement is involved, then important state regulatory interest which outweigh the infringement may suffice. Well, that raises some interesting questions in this context, which is what important state regulatory interest could conceivably be here? What is the purpose of this entire statute? Is it to regulate elections to ensure fairness? Is it to prevent deception or misleading or the problems that are associated when a candidate jumps parties at the last second, things like that? No, the only interest here is that the state of Arizona felt that independents who don't belong to any party should have something to do on primary election day when the parties choose their candidates. I would submit this is not an important regulatory interest. This is not something which can outweigh a very strong First Amendment infraction, and it is something that could have been addressed much more easily in very simple fashion. As someone remarked to me the other day, if Arizona wishes independents to have something to do on primary day, let them choose their own candidates. Put them in as if they were a party, say, any independent who can get enough signatures on the petition goes on the ballot. They don't want to be independents for that reason. They don't want to have somebody up there bearing their logo. They want to be able to choose. Yes, Your Honor. Let me suggest to you another simple solution. I find it out on your opposing counsel. Wouldn't all of your concerns be satisfied if they allowed the Libertarians to opt out of the primary? Yes, Your Honor. That was basically what we did. That way the constitutionality of the statute would be upheld and all parties would be satisfied? Yes, Your Honor. Well, you don't want to do that, do you? Well, Your Honor, our whole purpose was basically, I wouldn't say to get out of the primary per se, but to get out of the open primary that they have. You don't want other people to be able to vote in your primary. Yes, Your Honor. But you don't want to say we don't want any primary at all. No, Your Honor. No, Your Honor. I did misunderstand the question there. Well, allowing a party to opt out. I mean, if we could simply say we have an old-fashioned closed primary and nobody else votes in it but our registered voters, then, I mean, that was the whole purpose of the lawsuit. That's what you want, is to strike down the whole, but. No, but every other party could have an open primary. In fact, I think that was suggested by opposing counsel. Yeah. Yeah. We just like an old-fashioned closed primary. We don't want everybody else walking over in. And they want an old-fashioned open primary. Yes, Your Honor. Two kinds of old-fashioned primaries here. Yes, sir. Old-fashioned sort of modified open primary. I gather these come in an infinity of variations. One reason I've never gotten into politics. But, Your Honors, one of the points is we're speaking about independence here, but also parties which don't get ballot recognition are entitled to jump ship and vote in any primary they want. So you have cases where you have political parties that are essentially loggerheads. In this case, one example would be the Greens versus the Libertarians, which on economic issues, on social issues are the same, but on economic issues, of course, they're opposites in the bowl. Under this provision, Greens can vote in the Libertarian primary. So your ideological opponents get to vote in your primary, choose your officials, and choose your candidates. How serious a problem, as a practical matter, is this? Your Honor, I can only say that the Independents and the Greens and all the other groups outnumber registered Libertarians by 25 to 1. Is there anything in this record about how many Greens there are in Arizona? I believe it may be in Peter Schmarl's affidavit, Your Honor, or declaration, which is like page 01. It's in the excerpts of record. Uh-huh. Okay. Is the seriousness of this problem, as a practical matter, something... Assume for a moment, it may or may not happen, but assume for a moment that we decide that the election of precinct committee people, that can't stand. But the question of severability, it remains open, and the question as to whether or not the ability to vote for candidates is permitted under this system remains open. Yes. Is that something that should be decided in the first instance by the district judge rather than by this court? I think the district judge did, in a way, decide it by issuing the order. It's just that his minute entry doesn't address the other question. I read pretty carefully everything he wrote, and I don't find much directed to that separate question. Yes, Your Honor. I think that is a point which can be dealt with here by affirming his decision on the basis that something which, you know, you can affirm a decision whether the trial court cites it in the minute entry or not. Isn't there some – what about the argument by your adversary that there is a factual burden here to show that there's a real risk of people coming in and upsetting your election with respect to candidates? Yes, Your Honor. I believe he cites Jones as a roadmap to making the challenge. Jones is a rather extraordinary case. Jones involved a party which, frankly, had a lot of money to do the sort of surveying that sort of thing requires. If you look at other cases, First Amendment cases such as Tashtian or whatever, there's no statistical analysis that underlies them, but they still strike down the state measure as violative of the First Amendment. When we're dealing with the First Amendment, I don't think it's incumbent upon a person to demonstrate by statistical means and scientific studies that his freedom of expression or association is being impaired or what the outcome is. And when that came up in the California Democratic Party case, U.S. Supreme Court, yes, there is a lot of statistical stuff, but up and down at the end, the Court says that the argument is essentially, well, the potential for malicious crossover, that is, one party subverting the other, is minimal, and the potential for friendly crossover affecting an election is unlikely to affect an election except in the rarest cases. And then the Supreme Court says one election is enough. We're not going to buy that argument. So after citing all that, it basically doesn't depend upon it. And it specifically saves out the question of the open primary of which this is a subspecies. To the extent that Jones or the California Democratic Party case gives us a road map, I think it says, well, you know what, that's off the end of the road. There is no map for that. And I think here, just on a practical basis, the Libertarians are numbered 25 to 1 by the group which is coming in to vote. If only one out of 25 of them votes. But you're lumping together independents and other parties. Yes, Your Honor. Like I say, if only one out of 25 votes, not only would they be able to determine an election, they'd outnumber the real voters, the real Arizona Libertarian Party voters. So I believe Mr. Schmurl's affidavit also pointed out that in some precincts, when you're talking precinct committeemen, the vote consists of one or two votes. The party is widely dispersed. You have over 1,000 precincts in some counties, and fewer than 1,000 voters turn out for the primary. So we're talking where the election of precinct committeemen, in any event, could be determined by one person who showed up at the ballot. I'm not sure which way that cuts. Well, it doesn't exactly endorse enormous local support. However, on the other hand, it does suggest that elections can be turned. I think the opposing affidavits pointed out there was one contested primary for the U.S. House of Representatives, and it went by a landslide of 70 votes. The reason was there were like 150 on one side and 220 on the other. So with 400,000 independents and others in the state, it's not like there was a small statistical risk that they could affect the outcome of this party's business. But one of the interesting things, in a way, is that the argument, I think the counsel argues himself out of one position only to argue himself into another. On the one hand, he says, well, there wouldn't be enough to affect an election. There would be no practical result in the body politic at all. It just gives the independents something futile to do on Election Day. Well, if he makes that argument and it's successful, he may get out of the strict scrutiny, but then he bounces over to the other question, the important state regulatory interests, which are so strong as to outweigh the First Amendment. And now the argument is this consists of the total benefit of this legislation is that it permits some people to do a futile act on Election Day. I respectfully suggest that's not enough to justify an infringement of the First Amendment. That's not enough to justify allowing this sort of intrusion into the private affairs of a political association, which is asking in this aspect nothing better from the state than to leave it alone and let its own people choose its leadership and choose its standard bearers. One of the questions that arises also is fundamentally, what are the people who are being allowed in to vote in the primary here? And they're people who, as you're on our observe, don't want to belong to a party, don't want to become a libertarian or any of the other two recognized parties. That sounds like the quintessential libertarian. That is a contradiction. That is a question that I raised when I was a college student. Once I received news that there was a meeting of anarchists, and I asked whether they were following the parliamentary rules or Roberts. Here you go. So basically there are people who just don't want to associate with the party organization and be recognized as such. And people who, as Your Honor points out, don't count toward getting us ballot status because, after all, when you go into the state to ask for ballot status based on registration, the answer is they're not affiliated with you. And yet at the same time, basically people who are refusing to affiliate with us to give us the strength that might give us on the ballot are coming in to vote in the primary to choose the leadership of the party and its candidates for no apparent reason other than, well, they sort of like to meddle in your affairs. I respectfully suggest that that is not a valid interest, regulatory interest, I stress, of the state sufficient to justify this manner of imposition. Are we really to assume that anyone who wants to vote in your primary who is not affiliated previously with the Libertarian Party is out to disrupt it and that they're not out because the presumption behind this whole scheme is that people who are independents might wish to play a part because they are sympathetic to that party's what it stands for and they want to have a voice in choosing the candidate? So I don't see how we can assume that they're going to be disruptive. Your Honor, they may very well be in some way sympathetic, but they're still not affiliated. The other thing is there is some potential for that because obviously the two major parties, each one of whom have another party in their general area, which functions frankly to drain off votes from them. The Democrats have the Greens, the Republicans have the ALP. And I would not at all consider it impossible that one of the major parties should decide to deal with this pest over on the side who's draining off my votes by making sure that they get for their candidates the village lunatic, which is what crossover voting tends to do. I actually had a boss back east who, when I worked at Interior, he'd wound up in trouble. He was a Republican administration and he had to try to explain to the White House personnel office that that's just why you vote in the Democratic primary. And it was exactly that. I hadn't heard of the practice before that. It went over and made sure that they got the worst possible candidate. And I would not at all regard that as impossible in this context since there were some, what was it, let's just say after the last election, especially the major parties. I guess what's troubling me is whether or not you don't have some kind of burden to show that that's likely to happen. I can't give you the statistical evidence, Your Honor, and I don't know if I had a million dollars for the surveying just how you would even figure it out. But I think that sort of risk is incumbent any time the state chooses to essentially hand the leadership of a political party to a group of people who are not affiliated with it, whether they're friendly or unfriendly, sympathetic or not. I mean, if there is a risk there, it's something the party has to choose to assume. Well, suppose you put it the other way and the state said, okay, the Ninth Circuit has said we can't open it up, so now we're going to say you have to have registered within the party five years before five years. Are there any limits there? Probably there would be, Your Honor, but I'd have to go out and do the research before I argued them. Well, I mean, obviously at some point there will be an outer limit as to that sort of thing. Inside that limit, it might be reasonable regulation of an election. I can't say where that line would be drawn. But one interesting thing is the contrast between Tashijin. I don't know if I'm pronouncing any of these names correctly. For some reason, all election cases seem to have names that you simply cannot puzzle out. But Tashijin, of course, says if the party wants to let independents vote in this primary, the state cannot forbid it. The California Democratic Party takes sort of the flip side of the blanket primary, and one of the things the California Democratic Party poses in, I think, footnote number seven, is the majority is there criticizing the dissent. Tashijin says you have to let them let outsiders in if they want to. The dissent position here, that you could have the blanket primary and force outsiders upon them, if accepted, leads to an anomalous result, which is that the First Amendment protects the party allowing outsiders in but does not protect the party from having outsiders thrust upon it, with the result that the First Amendment essentially protects a party's ability to vary from its purpose but does not protect its ability to adhere to its fundamental purpose. And I think that's a valid criticism of the state's position here as well. In sum, Your Honors, we're dealing with the very core of the First Amendment, political association or political rights. We're dealing with a political party that has a fundamental basis not shared by the other parties, that differs from them in that respect, and that asks nothing better than to be left alone in its own primary to choose its own officials. And as a countervailing standard of which the state contends is perhaps even meets strict scrutiny, the state proposes that the independents should be given something to do on primary election day. As I've said, I don't believe that meets important regulatory standards. It's not something designed to ensure the honesty or fairness of elections, and I don't think it weighs against the First Amendment in this balance. Thank you. Thank you. Thank you, Your Honor. Yes, we want to give independents something to do on election day. We want them to participate in the process. That is a compelling state interest in increasing voter participation. You might be interested to know in the record on page 27 that the Libertarian Party actually opened up its 1998 primary to independents. Now they're here arguing that they're all evil and they were out to- Sounds like they had a bad experience. The other thing that needs to be emphasized, again, is that there were no contested precinct committee men races in the election, so the Court's main concern with internal party governance being at risk was not a valid concern in this election. The other thing to emphasize is that the Libertarian Party does know of the independents that vote in its primary. And when I say independents, that means people that might be with a small party not recognized, and they can then reach out to those folks to try to bring them into their fold. So they do know who they are. They don't know how they voted. And the last thing that I would emphasize is that in this case, one of the plaintiffs ran for governor in the Libertarian Party primary in one of the very few contested races, and that individual never submitted an affidavit saying that that in any way affected his positions or his platform. So in closing, we would ask that the Court to reverse the district court's decision and uphold the constitutionality of Arizona's open primary law. Thank you. Thank you. The Court appreciates the arguments presented in the case. The case is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Dw Nelson, W. Fletcher